UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**RONDIGO, L.L.C. ET AL.,**
a Michigan limited liability company,
**DELORES MICHAELS** and
**RONALD MICHAELS,**

    Plaintiffs,

vs                                                                  Case No: 05-74775
                                                                        Honorable Victoria A. Roberts

**CASCO TOWNSHIP, MICHIGAN,**
a Michigan municipal corporation,

    Defendant.
_____/


**ORDER**

**I.    INTRODUCTION**

    This matter is before the Court on Defendant's Motion to Preclude Plaintiffs' Expert on Economic Loss Testimony at Trial (Doc. #47) and Defendant's Motion in Limine to Strike Economic Loss Report as Untimely and to Preclude Expert Testimony at Trial (Doc. #58). For the following reasons the Court **GRANTS** Defendant's Motion to Preclude Plaintiff's Expert on Economic Loss Testimony at Trial (Doc. #47). And, in light of its November 28, 2007 Order resolving discovery disputes and extending the applicable deadlines, the Court **DENIES** Defendant's Motion in Limine to Strike Economic Loss Report as Untimely and to Preclude Expert Testimony at Trial (Doc. #58).

1

## II. BACKGROUND

Plaintiffs allege violation of their due process, equal protection, and first amendment rights under the U.S. Constitution, and violation of their due process and equal protection rights under 42 U.S.C. § 1983. Plaintiffs also claim fraudulent misrepresentation, negligent misrepresentation, and silent fraud under state law.

Defendant says Plaintiffs' expert report on profit loss fails to comply with the requirements of FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).

## III. ANALYSIS

### A. Factors

FED. R. EVID. 702 and *Daubert* guide a determination of the sufficiency of expert testimony. FED. R. EVID 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if *(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

FED. R. EVID. 702 (emphasis added); *see also Flanagan v. Altria Group, Inc.*, 423 F. Supp. 2d 697, 700 (E.D. Mich. 2005) (citing FED. R. EVID. 702).

In *Daubert*, the Supreme Court provided a framework for evaluation of expert testimony's compliance with Rule 702. Expert opinion must be both relevant and reliable. *Daubert*, 509 U.S. at 597. The relevance inquiry ensures "that 'there is a 'fit' between the testimony and the issue to be resolved by the trial.'" *Greenwell v.*

2

*Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999) (citing *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993)). "Expert testimony is relevant . . . when it will assist the trier of fact in understanding the evidence or determining a material fact in question. The party offering expert testimony must prove its admissibility by a preponderance of the evidence." *Flanagan*, 423 F. Supp. 2d at 699 (citing *Daubert*, 509 U.S. at 592-93 n.10). But, "[e]ven if the Court finds the evidence reliable and relevant, it must also determine whether its probative value is outweighed by its prejudicial effect" under FED. R. EVID. 403. *Flanagan*, 423 F. Supp. 2d at 699 (citing *Daubert*, 509 U.S. at 595).

The reliability step focuses on the methodology and principles that form the basis for the testimony. *Greenwell*, 184 F.3d at 497 (citing *Bonds*, 12 F.3d at 556). *Daubert* sets forth four "criteria that might assist trial courts in making a preliminary evaluation of expert testimony before admitting it." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001); *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997); *McGuire v. Alpinestars S.P.A.*, No. 01-466, 2005 U.S. Dist. LEXIS 12723, at *6-7 (W.D. Ky. June 22, 2005):

> (1) whether a theory or technique has been or can be tested;
> (2) whether the technique has been subjected to peer review and publication;
> (3) the known or potential rate of error; and
> (4) whether the technique has been accepted by the 'relevant scientific community,' or 'has been able to attract only minimal support within the community.'

*Daubert,* 509 U.S. at 593-94*; Gross*, 272 F.3d at 339; *Flanagan*, 423 F. Supp. 2d at 701.

"The test of reliability is 'flexible,' and *Daubert's* list of specific factors neither

3

necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire. Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999). "[T]he factors it mentions do not constitute a 'definitive checklist or test,'" and "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Daubert*, 509 U.S. at 151; *Kumho*, 526 U.S. at 150. "Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho*, 526 U.S. at 151. The Sixth Circuit holds that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross*, 272 F.3d at 339; *see Flanagan*, 423 F. Supp. 2d at 702.

When evaluating expert testimony, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596 (citing *Rock v. Arkansas*, 483 U.S. 44 (1987)).

At the same time:

[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to *admit opinion evidence which is connected to existing data only by the ipse dixit of the expert*. A court may conclude that there is simply *too great an*

4

> *analytical gap between the data and the opinion proffered.*

*GE v. Joiner*, 522 U.S. 136, 146 (1997) (emphasis added) (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992), *cert. denied*, 506 U.S. 826 (1992)). "*Daubert's* general holding . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, 526 U.S. at 141.

Some additional factors often applied to non-scientific technical experts, such as Plaintiffs' profit loss expert report, include:

> (1) whether or not the expert considered alternative theories of causation;
> (2) whether in general the testimony is helpful and relevant;
> (3) whether the expert relied on anecdotal evidence;
> (4) consideration of non-judicial uses of the expert's methods;
> (5) temporal proximity; and
> (6) evaluation of expert extrapolation.

Xavier Pena, Note, *The Effective Evaluation of Expert Reliability*, 20 Rev. Litig. 743, 770 (2001).

Lastly, the court "should also be mindful of other applicable rules." *Daubert*, 509 U.S. at 595. Under FED. R. EVID. 703, "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Ashburn v. General Nutrition Ctrs., Inc.*, No. 06-2637, 2007 U.S. Dist. LEXIS 87200, at *4-5 (N.D. Ohio Nov. 27, 2007) (emphasis added) (quoting *In re Paoli RR. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994) (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1245

(E.D.N.Y. 1985))).

**B.    Relevance**

Plaintiffs' expert's testimony could be relevant in that it could "assist the trier of fact in understanding the evidence or determining a material fact" regarding the damages to the Plaintiffs." *Daubert*, 509 U.S. at 595.

Although Defendant attempts to undermine the qualifications of Plaintiffs' expert by pointing out he has never done a loss evaluation for a composting site, it is clear the expert is qualified to render loss reports.  He is a duly licensed certified public accountant who has testified before and has made an evaluation of a waste removal business.  After careful examination of not "the qualifications of [the] witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question," the Court finds his training and qualifications relate to the subject matter of his proposed testimony.  Defendant's objection does not merit the exclusion of his testimony under *Daubert* or FED R. EVID. 702.  *Smelser*, 105 F.3d at 303 (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied*, 5 U.S. 111 (1995)).

**C.    Reliability**

1.    <u>Yardstick/Control Group Methodology</u>

The "yardstick" or "control group" approach to calculating lost profits employed by Plaintiffs' expert is widely accepted by courts to measure damages.  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002).  The yardstick test "consists of

a study of the profits of business operations that are closely comparable to the plaintiff's. Although allowances can be made for differences between the firms, the businesses used as a standard must be as nearly identical to the plaintiff's as possible." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974); Jonathan T. Tomlin & David R. Merrell, *The Accuracy and Manipulability of Lost Profits Damages Calculations: Should the Trier of Fact be "Reasonably Certain?"*, 7 Transactions 295, 297 (2006) ("The 'yardstick' or 'control group' approach entails comparing the plaintiff's performance to a financial benchmark based on an alternative geographic area, product line, distribution channel, industry, or firm. For example, the "yardstick" approach may create a hypothetical "but-for" scenario in which one assumes that the plaintiff would have obtained profits consistent with other firms in the same industry."). While Defendant does not directly challenge the use of the yardstick methodology by Plaintiffs' expert, it does challenge its application. Defendant primarily challenges the factual underpinnings that Plaintiffs' expert relies on to apply this methodology.

Nonetheless, general acceptance of the methodology is not enough to satisfy *Daubert* and FED. R. EVID. RULE 702. Plaintiffs' expert loss report must: (1) *be based upon sufficient facts or data*, (2) be the product of reliable principles and methods; and (3) *apply the principles and methods reliably to the facts of the case*. Plaintiffs' loss report fails the first and third Rule 702 requirements; it is not based on sufficient facts and fails to "draw a [reasonable] conclusion regarding the *particular matter to which the expert testimony was directly relevant."* *Kumho*, 526 U.S. at 154. (emphasis in original).

Plaintiffs argue the weight of the report is a question of fact for the jury, and the

weakness of their expert's loss report should not result in its exclusion. This argument overlooks that:

> When determining whether an expert's testimony is reliable, the court may consider the factual basis for the expert's opinion. Indeed, Rule 702 specifically states that an expert may only testify if *'the testimony is based upon sufficient facts and data and the witness has applied the principles and methods reliably to the facts of the case.* Courts may also review the factual basis for an expert's testimony under Rule 703 of the Federal Rules of Evidence. . . . Under Rule 703, courts have held that *if the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.*

*Ellipsis, Inc. v. Color Works, Inc.,* 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006) (internal quotations and citations omitted) (emphasis added).

2.  Insufficiently Supported Factual Foundations and Extrapolations

Several of the factual foundations and resulting extrapolations in Plaintiffs' expert's report are fundamentally flawed or unsupported, and result in the unprincipled application of this otherwise reliable methodology to the facts of this case. Each is addressed in turn. There are additional problems with the loss report, but the Court does not discuss them because they do not factor into the Court's decision.

i.  Truck Deliveries

Plaintiffs' economic loss report bases its loss estimate on the fact that 12,960 trucks per year (60 per day) will deposit raw material at the proposed composting site. This number is directly contradicted by Plaintiffs' own Operations Manual for the site, which estimates the number of trucks depositing raw material at the site at *230 truck loads per year*.

8

Plaintiffs explain this inconsistency by pointing to their expert's reliance on the fact that a composting operation previously operated by Plaintiff had "230 trucks visit[] that site in only four days." Plaintiff's Response to Defendant's Motion to Preclude Plaintiffs' Expert on Economic Loss Testimony at Trial at 7. This reasoning is a wholly inadequate basis for the expert loss report. The report states this number was derived from "a sampling of invoice activity in 2005." Econ. Loss Rep. at 5. But, there is no explanation for the use of this 2005 four day sample. The four days of truck deliveries could just as easily constitute the entire year's number of truck deliveries for the comparator site. Moreover, although the Plaintiffs' expert could have easily compiled a daily average from the comparator site for 2005 based on the entire years' deliveries, or a yearly average based on multiple years of operation, he instead selects data based on four specific days without an explanation for the selection of these days, or the reason he did not use a more representative and reliable number for his extrapolations. Neither the expert report itself, nor Plaintiffs' reasoning in their briefs, provides a sufficient explanation for the use of this comparator truck data.

This shortcoming weighs in favor of exclusion under *Daubert* and Rule 702.

ii. Acreage

The parties dispute the amount of acreage. The Court requested additional briefs on the issue of available acreage since it was not clear from the submissions -- what constituted a reasonable assumption of available acreage for the loss report. Defendant argues Plaintiffs inappropriately rely on 42 acres of available land for composting and that the inclusion of available land from a second adjacent parcel

9

purchased by Plaintiffs, is not appropriately included in the loss report. Pointing to its Exhibit 14, Defendant argues only approximately 14 acres were available for composting on the property in question, as described in the site plan submitted by Plaintiffs on October 6, 2005.

While Plaintiffs disagree and assert the acreage is greater, there is a more fundamental problem in the loss report which mandates its exclusion under *Daubert* and Rule 702. There is no logical connection between this site plan's available composting acreage and the expert's calculations and conclusions. Quite surprisingly, despite being the subject of an additional round of briefings, in rebutting Defendant's assertion that the report erroneously includes all 42 acres of the property as available for composting, Plaintiffs do not actually articulate how many acres the report did consider available for composting as a basis for calculations.

In their initial Response, Plaintiffs state, "defendant relies on the original site plan which was submitted, and not the revised site plan which would allow for the 42 acres for composting on Plaintiffs property." Later on in their Response Plaintiffs state, "[a]s noted above, the amended site plan allows for composting on 42 acres, justifying [the expert's] calculations." In their Surreply, Plaintiffs reverse course and state "[a]s to the Township's assertion in its reply brief that [the expert] report should be stricken because it assumes that plaintiffs have 42 acres on the site for composting, review of the report itself demonstrates that *[the expert] never made such a representation*." Plaintiffs' Surreply at 3-4, Doc. No. 73 (emphasis added).

Indeed, in their Surreply, Plaintiffs backtrack and state there is a "total acreage

10

for composting of approximately 26 acres." *Id.* at 2-3. Plaintiffs' Exhibit 3 (also Defendant's Exhibit 11-B) does state the plan includes 26 acres available for composting. However, nowhere is this number of available acreage, nor any assumed amount of acreage, stated as a factual foundation for the loss calculation in the report. Thus, it appears, Plaintiffs attempt to defend their report by arguing what the report *does not* rely on instead of what it actually does rely on. The report simply does not actually say what the assumed available amount of acreage is. This omission alone substantially weighs in favor of exclusion of the report since it is not the role of the Court, or the parties through their briefs, to retroactively impute factual foundations to the loss report; the underpinnings must be clear from the report itself. If even the Plaintiffs cannot determine or identify the amount of acreage relied on in the report, it speaks volumes towards the lack of a clear factual foundation for the report's conclusions.

Plaintiffs also attempt to supplement the acreage that would have been available to them for composting by directing the Court to an adjacent property. The loss report states the dispute, "stems from [Plaintiffs'] purchase of a forty-two (42) acre parcel located . . . at 5861 Bethuy Road." Econ. Loss Rep. at 1; *see* Pls.' Sur. at 4. The report does later mention the subsequently purchased adjacent property known as County Line Road. *See* Econ. Loss Rep. at 2 ("Since the Bethuy Road Property was made unusable for is intended purpose by the newly adopted ordinance and the actions of the Defendant, the Plaintiffs attempted to purchase an adjacent parcel of land . . . ."). However, the complaint for this action was filed on December 16, 2005, long before

Plaintiff purchased the adjacent property. Thus, the inclusion of the additional acreage in this adjacent property is unreasonable and unsupported by the facts. More importantly, as the loss report does not state the amount of available acreage assumed, it likewise does not indicate whether it included acreage from the adjacent property as a basis for calculations and extrapolations.

Plaintiffs' Surreply again attempts to salvage this deficiency by stating "[p]laintiffs have not undertaken full engineering site plan development of the County Line Property due to the issues with the Township, but would conservatively estimate that the additional 19.5 acres would yield an additional 10 acres for active composting, based on the ratio set forth in the February 2, 2004 site plan for the Bethuy Road property." Not only is such an assumption wildly speculative given that these two separate distinct properties are, just that, there is not even a preliminary site plan for this adjacent property upon which such estimates can be roughly based. Indeed, these estimates for the adjacent property *appear nowhere in the loss report itself*. Instead, they appear to be ex-post justifications by the Plaintiffs in response to Defendant's *Daubert* motion.

Plaintiffs' after the fact rationalizations of an unknown and assumed number of acreage attempts to defend an unknown unarticulated value. These shortcomings weigh in favor of exclusion under *Daubert* and Rule 702.

   iii.   <u>Start Date of Loss Calculations</u>

      A) <u>Special Land Use</u>

Defendant contests the start date for losses beginning in April 2004. It says that Plaintiffs voluntarily requested the Defendant withhold consideration of its final plan, and

thus, Plaintiffs cannot argue they are entitled to losses starting in April 2004 as assumed by their loss expert. Plaintiffs counter that the date is appropriate because their suit alleges violation of constitutional rights beginning prior to April 2004.

Plaintiffs fairly estimate the infringement of their rights began April 2004. They argue they requested suspension of consideration of their plan to allow the Defendant time to gather resources to buy the property back and avoid litigation. Given the date the infringement began, it is not unreasonable to calculate damages beginning April 2004.

However, Plaintiffs' expert's start date for losses is not sufficiently supported by the facts for a different reason. Plaintiffs say they did not need a permit from MDEQ because they were not going to disturb the wetlands on the property. Nonetheless, changes to their site plan to avoid the disruption of wetlands required a wetlands delineation report. Plaintiffs did not have a completed wetlands delineation report until October 5, 2005. *See* Def.'s Mot. Prec. Pls.' Exp. Econ. Loss at 6. It would not have been possible for Plaintiffs to utilize their property without disturbing wetlands, without knowing the precise location of these wetlands. Similarly, Plaintiffs' site plan needed to incorporate the changes required by the delineation of wetlands in order to be finalized and approved by the Township. On June 2005, Plaintiffs informed the Township it would not be able to submit a revised plan in June because they were unable to complete the wetlands related revisions to their site plan. The delineation report was not completed until October 5, 2005. *See* Defendant's Motion at 6; Exhibit 38, Doc. No. 39.

13

Even without alleged unconstitutional conduct on the part of the Defendant, the Township could not have approved Plaintiffs' site plan before completion of a wetlands delineation report, and incorporation of the wetlands considerations into the site plan. In light of this independent limitation, an April 2004 start date *is* unreasonable and not supported by the facts.

Plaintiffs' loss report begins loss calculations more than a year before approval (let alone commencement of composting operations) was even possible.

This shortcoming weighs in favor of exclusion under *Daubert* and Rule 702.

### B) County Drain Commission

Approval by the County Drain Commission was necessary for Plaintiffs to operate a composting facility on their property. As of September 19, 2005, the Township Drain Commission had identified 24 separate deficiencies in Plaintiffs' site plan. *See* Def.'s Mot. Prec. Pls.' Exp. Econ. Loss at 6. The Drain Commission is not a Defendant in this litigation, and Plaintiffs do not allege it was guilty of violating their rights. Thus, a loss start date before September 2005 is unreasonable and not supported by the facts.

This shortcoming weighs in favor of exclusion under *Daubert* and Rule 702.

### C) Expert's Inability to Explain Rationale of Start Date

Perhaps the strongest argument supporting the lack of a rational tie between the expert's loss start date and the facts, is the inability of the expert to explain the basis for the start date during his deposition. In response to questioning by Defendant's counsel,

Plaintiffs' expert could not articulate a specific factual basis for selecting the start date of April 2004. *See* Def.'s Mot. Prec. Pls.' Exp. Econ. Loss at 2-4; Deposition Transcript of Michael Kahaian December 8, 2006, Doc. No. 49, Exhibit 2. This shortcoming weighs in favor of exclusion under *Daubert* and Rule 702.

3.   Professional Standards

Lastly, the Court notes that *Daubert* and Rule 702 require that "whether basing testimony upon professional studies or personal experience, [the expert should] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Plaintiffs' expert specifically states in the loss report "I have not been engaged to compile, review, or examine [information for this report] in accordance with attestation related standards established by the American Institute of Certified Accountants." Econ. Loss. Rep. at 10. As this expert's knowledge is primarily technical, and significantly based on his certification as a certified public accountant, this deviation from "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," weighs in favor of exclusion under *Daubert* and Rule 702. *Id.*

**IV.   CONCLUSION**

Viewed separately the shortcomings of this report might not merit exclusion. However, collectively they merit exclusion under *Daubert* and Rule 702. Plaintiffs' expert's calculations simply lack a reasonable basis in fact. Acceptance of this expert testimony would distort *Daubert* beyond recognition.

15

The Court **GRANTS** Defendant's Motion to Preclude Plaintiffs' Expert on Economic Loss Testimony at Trial and **DENIES** Defendant's Motion in Limine to Strike Economic Loss Report as Untimely and to Preclude Expert Testimony.

**IT IS ORDERED**.

                                                            /s/ Victoria A. Roberts
                                                            Victoria A. Roberts
                                                            United States District Judge

Dated: January 29, 2008

> The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 29, 2008.
>
> s/Linda Vertriest
> Deputy Clerk